UNITED STATES of America, Appellee,

v.

**Paul GALLERANI and Herbert Gray,
Defendants–Appellants.**

**Nos. 1555, 1556, Dockets 94–1365, 94–1366.**

United States Court of Appeals,
Second Circuit.

Argued May 23, 1995.

Decided Oct. 17, 1995.

Paul J. Van de Graaf, Assistant United States Attorney, Burlington, Vermont (David V. Kirby, Acting United States Attorney, Burlington, Vermont, on the brief), for Appellee.

F. Dennis Saylor, IV, Boston, Massachusetts (Goodwin, Procter & Hoar, Boston, Massachusetts, Donald E. O'Brien, Burlington, Vermont, John T. Sartore, Paul, Frank & Collins, Burlington, Vermont, on the brief), for Defendants–Appellants.

Before: VAN GRAAFEILAND, KEARSE, and WALKER, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Paul Gallerani and Herbert Gray appeal from judgments entered in the United States District Court for the District of Vermont following a jury trial before Franklin S. Billings, Jr., Judge, convicting them on one count of conspiring to impede federal regulatory agencies in the performance of their banking supervision functions, in violation of 18 U.S.C. § 371 (1988); five counts of making false entries in bank records, in violation of 18 U.S.C. § 1005 (1988 & Supp. V 1993), and 18 U.S.C. § 2 (1988); three counts of bank fraud, in violation of 18 U.S.C. § 1344 (1988 & Supp. V 1993), and *id.* § 2; one count of bank bribery, in violation of 18 U.S.C. § 215 (1988 & Supp. V 1993), and *id.* § 2; and one count of making false statements to a financial institution, in violation of 18 U.S.C. § 1014 (1988 & Supp. V 1993), and *id.* § 2. Gallerani was also convicted on one additional count of making false bank entries in violation of 18 U.S.C. §§ 1005 and 2. Gallerani was sentenced principally to 37 months' imprisonment, to be followed by a three-year period of supervised release, and ordered to pay $300,000 in restitution. Gray was sentenced principally to 24 months' imprisonment, to be followed by three years' supervised release, and ordered to pay $245,000 in restitution and a $50,000 fine.

On appeal, defendants contend, *inter alia,* that the district court improperly instructed the jury with respect to (1) the objects of the conspiracy alleged in the indictment, and (2) the scope of each defendant's liability for substantive offenses committed by coconspirators. We agree, and we therefore vacate the convictions as to all counts and remand for a new trial.

## I. BACKGROUND

The present prosecution arose from alleged widespread misconduct and fraud by senior officials of the Independent Bankgroup, Inc. ("IBG"), a Vermont bank holding company, and IBG's three subsidiary banks, Bradford National Bank ("BNB"), Caledonia National Bank ("CNB"), and First National Bank of Vermont ("FNB") (collectively "the IBG banks"). All three banks had failed by early 1993.

From 1976 until April 1991, Gallerani was president of BNB and a member of its board of directors. He became president of IBG in 1983 and thereafter became a director of IBG, FNB, and CNB. From at least 1985 until April 1991, Gray was chairman of the

board of directors of BNB and a director of IBG. At various times during this period, Noel Lussier ("Lussier") was chairman of IBG's board of directors, a member of BNB's board of directors, and president and chairman of CNB. The government contended that Gallerani and Gray, along with Lussier, had, *inter alia,* caused their banks to enter into transactions in which they had undisclosed financial interests, and conspired to defraud the United States by falsifying bank documents in order to obstruct federal bank examiners' oversight of the IBG banks.

The government's case was presented principally through hundreds of bank documents and the testimony of numerous witnesses, including several individuals who had pleaded guilty to crimes related to the same course of conduct that gave rise to the charges against Gallerani and Gray. Taken in the light most favorable to the government, the evidence presented at trial showed the following.

A. *The Evidence of Unlawful Dealings by Defendants*

In their roles at IBG and its subsidiaries, Gallerani and Gray had participated in numerous bank examinations and had approved the adoption of bank policies consistent with federal banking regulations, which, *inter alia,* (1) required the disclosure of insider interests in proposed bank transactions, (2) prohibited participation by an insider in lending decisions in which he had an interest, and (3) limited the permissible amount of lending to an insider and his related business interests. Under federal regulations, for example, Gallerani and his related entities were permitted to borrow no more than $100,000 from BNB. Gallerani and Gray were also required by law to prepare and sign annual "Statements of Related Interests" ("SRIs") disclosing their interests in businesses, including partnerships, that engaged in transactions with the IBG banks, in order to assist the banks and the United States Office of the Comptroller of the Currency ("OCC") in monitoring compliance with these regulations.

Most of the substantive offenses of which defendants were accused related to partner-

ships through which they concealed their interests in transactions with the IBG banks. For example, in 1985, Carl E. Kelton, a Vermont truck and car dealer who was facing severe financial difficulties, sought help in obtaining bank financing for his businesses. Gallerani arranged a $2.5 million loan package from Lyndonville Savings Bank ("Lyndonville"), a Vermont bank run by Noel Lussier's brother. Because banking laws prohibited Lyndonville from lending more than $2 million to any one individual business, Gallerani arranged to have Lyndonville lend $1.1 million to Kelton directly, and lend the remaining $1.4 million to a partnership known as "Four Friends," which had been formed by Gallerani, Gray, Lussier, and one Raymond Jasmin; Four Friends passed the $1.4 million on to Kelton, who agreed to repay Four Friends a total of $1.6 million. Federal regulations required bank officers and directors to disclose their receipt of loans from outside institutions. Nonetheless, a few days after the closing, Gallerani and Gray signed SRIs that did not disclose their participation in the Four Friends partnership.

Further, in mid–1986 Kelton was unable to meet his obligations on the $2.5 million he owed, and Gallerani, Gray, and Lussier arranged for BNB to participate in $500,000 of a $3 million loan refinancing through Lyndonville. Gallerani, Gray, and Lussier defended the loan proposal at a meeting of the BNB board of directors and voted in favor of the loan, without disclosing their interest in the refinancing.

Beginning in 1986, Gallerani and/or Gray also participated in various partnerships that borrowed money directly from BNB, CNB, and FNB to purchase stock in IBG and other companies, while Gallerani and Gray concealed their interests in the loans. For example, Gallerani formed a partnership with Graham Blake, a director of IBG and CNB, for the purpose of purchasing securities. In December 1986, Gallerani approved a $136,250 unsecured loan by BNB to Big "G" Corp., a corporation owned by Blake; Gallerani later approved deferrals of principal payments that otherwise would have become due, both on this loan and on a second loan to

Big "G" in the amount of $102,500. Gallerani testified that he knew (a) that federal law limited his borrowing from BNB to $100,000, and (b) that BNB's board had further limited his borrowing to $50,000. The proceeds of both Big "G" loans were used by the Blake–Gallerani stock-speculation partnership. Neither the loan documents, nor Gallerani's subsequent SRIs, nor his responses to IBG officer and director questionnaires disclosed his interest in the loans.

In February 1987, Gallerani, Gray, Lussier, and Blake formed a partnership for the purpose of purchasing IBG shares worth nearly $1 million. The shares were purchased by the partnership using the proceeds of loans by FNB to Gray and Blake, and were issued in the names of Gray and Blake, with their respective spouses. Gallerani and Lussier received profits from this venture and paid some of the interest due on the loans. The interests of Gallerani and Lussier were not disclosed in the loan documents, or in SRIs signed by Gallerani, or in public proxy statements issued by IBG.

In early 1987, Gallerani, Gray, and Lussier formed a partnership for the purpose of investing in securities through a margin account with a New Jersey brokerage firm. To fund this partnership's investments, Gallerani and Gray obtained a $200,000 unsecured loan from CNB in February 1987, failing to disclose in loan documents that Lussier, CNB's president and chairman, had an interest in the proceeds of the loan. The loan exceeded the $100,000 limit on borrowing from CNB by Lussier and any of his related interests. Lussier approved the loan, and on several occasions he voted to renew the Gallerani–Gray loan while Gallerani himself abstained, though both had the same interest in the loan. Between 1987 and 1991, Gallerani and Gray obtained numerous additional loans from CNB and BNB for the purpose of funding investments by this partnership with Lussier, without revealing the true purpose of the loans or Lussier's interest in them.

Gallerani began experiencing financial difficulties in 1989 as the value of his stock portfolio began to decline. In June 1989, he obtained a $37,500 loan from BNB, most of

which he used to cover a margin call on a personal brokerage account. He did not disclose that the proceeds would be used for this purpose but rather stated in the loan application documents that the proceeds were to be used for land improvement and to "[p]urchase livestock for resale."

In 1990, Gallerani and Gray engaged in fraudulent activity of a slightly different type, attempting to rid the IBG banks' books of a problem asset. The banks had acquired title to a hotel as a nonearning asset following the hotel purchasers' default on loans. Gallerani and Lussier persuaded one William Hill to buy the hotel for $2.45 million with no down payment, using the proceeds of a loan to be provided by the IBG banks; the loan to Hill was to be shown on the IBG banks' books as an income-generating asset. However, federal regulations prohibit a bank from classifying as an income-generating asset a loan that provides 100% financing for the purchase of an asset classified as nonearning. In order to avoid this prohibition, Gallerani recommended to the boards of BNB, CNB, and FNB that Hill be extended a $2.2 million mortgage loan, and he represented that Hill would use his own funds to pay the remaining $250,000, by selling two houses owned outright by Hill. In fact, as Gallerani and Gray knew, Hill had an outstanding CNB loan on one of the houses and did not own the other. Indeed, Gray himself had an ownership interest in one of the houses. Neither Gallerani nor Gray disclosed these facts to the IBG banks' boards. Gray and Lussier voted in favor of the proposal.

Gallerani also arranged for Hill to issue a promissory note at the closing on the hotel, rather than paying the $250,000 in cash. The note falsely indicated that Hill owned two houses that would be sold in order to satisfy the note. When FNB's president subsequently learned that Hill did not actually own the houses, he insisted that the $2.2 million mortgage loan could not be designated an income-generating asset on the bank's books until Hill paid the $250,000 with his own money. To help Hill make the $250,000 payment, Gray and Lussier persuaded another associate, Jac Howard, to borrow $170,000 from CNB with one of the houses as collater-

al and pass that sum to Hill, in exchange for a $170,000 promissory note signed by Gray, Hill, and Lussier. The CNB loan documents supporting Howard's application did not disclose the interests of Gray and Lussier in the loan. Lussier approved the loan.

In March 1991, during an extensive investigation of the IBG banks, OCC issued cease-and-desist orders against CNB and BNB which, *inter alia*, (1) prohibited them from engaging in any transaction with any officer or director of an IBG bank involving more than $10,000, (2) ordered the banks to review all of its transactions with IBG insiders since 1988, and (3) required each officer and director to provide OCC with a list of his "related interests," including all loans in which the officer or director had any interest, direct or indirect. OCC expressly instructed Gallerani that all partnerships in which he had an interest must be disclosed in his response to the cease-and-desist order. Thereafter, Gallerani submitted to OCC a response that did not disclose his interests in, *inter alia*, the 1986–87 BNB loans to Big "G" Corp. whose proceeds were used to fund his stock-speculation partnership with Blake, and the February 1987 loans from FNB with which Gray and Blake had made stock purchases for the partnership of Gallerani, Gray, Lussier, and Blake. Gray too, in his response to the OCC orders, failed to disclose certain of his interests in loans related to the above-described transactions. In April 1991, Gallerani, Lussier, and Gray were removed from their IBG-related positions.

Following the commencement of the OCC examination, Gallerani and Gray engaged in further efforts to avoid disclosing their concealed conflicts of interest with respect to certain transactions. By 1989, Kelton's businesses had collapsed despite the efforts of defendants and others to shore them up; this failure had resulted in litigation commenced by Jasmin involving a $600,000 loan from BNB, which Gallerani had urged Jasmin to obtain in order to assist Kelton. During the OCC examination, Gallerani, Gray, and Lussier called special BNB board meetings in an effort to facilitate a settlement of the Jasmin litigation. Another member of the board, concerned about the haste with which the

three were negotiating the settlement, demanded to know whether any of them had had prior dealings with Jasmin; all three denied that they had.

### B. *The Trial Court's Instructions on the Conspiracy Charge*

Gallerani and Gray were indicted in January 1993, along with Lussier and Lussier's son Matthew, on charges of conspiracy and various other banking-related offenses. In July 1993, after Lussier and Matthew pleaded guilty to various offenses (Matthew eventually testified at the trial of Gallerani and Gray), a similar 13–count superseding indictment, which is at issue here (the "indictment"), was returned, naming as defendants only Gallerani and Gray. The indictment charged them with various substantive counts, including bank fraud, *see* 18 U.S.C. § 1344; bribery of a bank official, *see id.* § 215; making false statements in order to procure a loan from BNB, *see id.* § 1014; and making false entries in bank documents in order to defraud IBG, BNB, or CNB, and federal bank examiners, *see id.* § 1005. The conspiracy count charged that Gallerani and Gray had violated 18 U.S.C. § 371 by conspiring (a) "[t]o defraud the United States by impeding the OCC and the Federal Reserve Bank in the performance of their lawful governmental functions," through the use of deceitful and dishonest means to obstruct those agencies in the monitoring of the IBG banks' transactions, and (b) to cause the making of false entries in the records of the IBG banks, "with intent to ... defraud IBG and the IBG banks and to deceive the OCC and the Federal Reserve Bank, in violation of 18 U.S.C. § 1005."

Prior to the submission of the case to the jury, both the government and defendants submitted to the trial court requests as to, *inter alia*, how the jury should be instructed with respect to the objects of the alleged conspiracy. The government requested that the court (1) read to the jury the conspiracy count in its entirety as set out in the indictment, and (2) instruct the jury that it could find defendants guilty of the alleged conspiracy if it found either that they had conspired to violate a federal criminal law or that they

had conspired to defraud the United States by obstructing or impeding the legitimate functioning of the government through fraudulent or dishonest means.

In a conference with counsel, the court indicated that it "intended to give in substance" the government's requested instructions. (Trial Transcript XII, at 75.) In instructing the jury, however, the court described the objects of the alleged conspiracy as follows:

> In Count 1 of the indictment the government charges both defendants with conspiring (1) to use their positions as directors and officers of certain banks to procure loans without disclosing their interests; (2) to cause third parties to enter into loans without disclosing their interests; (3) to purchase stock with loan proceeds from the banks without disclosing their interests; (4) to submit false reports of their interests in those loans to the bank[s]; (5) to falsely inflate the profits of these banks by disguising non-performing loans; (6) and to conceal important information regarding loans to themselves and other conspirators.
>
> In order to satisfy its burden of proof on Count 1, the government must establish two essential elements beyond a reasonable doubt: First, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment; and, second, that the defendant knowingly and willfully associated himself with the conspiracy and participated in it.

(Trial Transcript XIV, at 12.)

Defendants objected to this description of the objectives of the alleged conspiracy:

> Your Honor, on the conspiracy count, the defense believes that the government charged a broader conspiracy, farther reaching conspiracy, than the conspiracy described in the charge to the jury; that the government specifically charged that the conspiracy was intended to defraud the OCC and government bank examiners, and not simply to commit the substantive crimes charged; that, also, there was a specific charge in the indictment in the

paragraphs that describe the conspiracy that the conspiracy was specifically to commit the crime of false entry in violation of Section 1005.

(*Id.* at 40–41.) In response to this objection, the government suggested that the court simply tell the jury to read the text of the indictment. The trial judge gave corrective instructions with respect to several other matters, and he gave the jury a copy of the indictment; but he did not read the indictment to the jury or expressly tell the jury to read the indictment, and he did not mention the scope of the conspiracy as charged in the indictment.

The jury convicted each defendant on all counts in which he was charged. Defendants were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

On appeal, Gallerani and Gray contend principally that the district court failed to instruct the jury properly with respect to the specific objects of the conspiracy alleged in the indictment. They also contend that the court gave an erroneous instruction as to each defendant's liability for substantive crimes committed by coconspirators. For the reasons below, we agree with both contentions.

### A. *The Instruction on the Objects of the Conspiracy*

Section 371, the conspiracy section under which Gallerani and Gray were charged, makes it a crime for

> two or more persons [to] conspire either to commit *any offense against the United States, or to defraud the United States, or any agency thereof* in any manner or for any purpose, [if] one or more of such persons do any act to effect the object of the conspiracy.

18 U.S.C. § 371 (emphasis added). The indictment alleged that Gallerani and Gray had conspired, in violation of § 371,

> a) To defraud the United States by impeding the OCC and the Federal Reserve Bank in the performance of their lawful

governmental functions by obstructing through deceit, trickery, and dishonest means the monitoring of the true nature of bank transactions at IBG and the IBG banks; and

[ ]b) To cause the making of false entries in books, reports, and statements of IBG and the IBG banks, with intent to injure and defraud IBG and the IBG banks and to deceive the OCC and the Federal Reserve Bank, in violation of 18 U.S.C. § 1005.

(Indictment ¶ 19.) Section 1005, with respect to, *inter alia,* national banks, prohibits any person from

mak[ing] any false entry in any book, report, or statement of such bank ... with intent to injure or defraud such bank ... or to deceive any officer of such bank ... or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank ... or the Board of Governors of the Federal Reserve System.

18 U.S.C. § 1005.

Defendants contend that the trial judge was required to instruct the jury that it must find that defendants had at least one of the objectives alleged in the indictment in order to find them guilty of conspiracy as charged. They contend that the court's omission relieved the government of its fundamental burden of proof on the conspiracy count. The government argues that this contention has been waived because defendants failed to object to the omission; that, in any event, the omission was cured by the court's giving the indictment itself to the jury; and that if the omission was not cured, the error was nonetheless harmless. We reject all of the government's arguments.

■ To preserve an objection for appellate review, a defendant must articulate it to the trial court with sufficient distinctness to alert the court to the nature of the claimed defect. *See* Fed.R.Crim.P. 30; *see also United States v. Kwong,* 14 F.3d 189, 195 (2d Cir.1994); *United States v. Civelli,* 883 F.2d 191, 194 (2d Cir.), *cert. denied,* 493 U.S. 966, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989). Here,

the government had requested an instruction informing the jury that in order to convict defendants of conspiracy, it needed to find they had conspired to violate a federal criminal statute or to defraud the United States by fraudulently obstructing or impeding federal agencies in the performance of their duties; and the court, in its charging conference, stated that it would so charge the jury in substance. When the instructions actually given did not specify these objectives, defense counsel promptly objected. Gray's attorney stated that the indictment "specifically charged that the conspiracy was intended to defraud the OCC and government bank examiners, and not simply to commit the substantive crimes charged; that, also, there was a specific charge in the indictment ... that the conspiracy was specifically to commit the crime of false entry in violation of Section 1005." (Trial Transcript XIV, at 41.) This objection was sufficient to alert the court that it had not informed the jury that it must find that the objectives of the conspiracy were the violation of § 1005 and/or the deceiving of federal agencies. We conclude that defendants' present challenge has been properly preserved for appeal, and we now turn to the merits.

■ Due process requires the trial court to charge the jury on all the elements of the crimes alleged in the indictment. *See Francis v. Franklin,* 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985). A court's failure to instruct the jury on some of the elements of a charged crime has the effect of relieving the prosecution of part of its burden of proof in obtaining a conviction. *See United States v. Rogers,* 9 F.3d 1025, 1032 (2d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 95, 130 L.Ed.2d 45 (1994); *United States v. Smith,* 939 F.2d 9, 10–11 (2d Cir. 1991) (per curiam), *cert. denied,* —— U.S. ——, 114 S.Ct. 209, 126 L.Ed.2d 165 (1993). The allegedly erroneous instruction "must be considered in the context of the charge as a whole," *Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985), but the complete omission of an element of an offense violates due process.

■ "Without question, the object of a conspiracy constitutes an essential element of

the conspiracy offense" defined by 18 U.S.C. § 371. *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir.1992); *see also United States v. Lara*, 47 F.3d 60, 65 (2d Cir.1995) ("a conspiracy conviction requires proof of active participation with knowledge of the venture's illegal purpose"). Moreover, we have emphasized the need for particular vigilance in enforcing the government's burden of proof in prosecutions under § 371, in view of the "broad range of conduct covered by the federal fraud statutes" and the risk that a defendant may be convicted of conspiracy based upon an agreement other than that specifically charged in the government's indictment. *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir.1988) (overturning conviction on ground that government's variant proof at trial, in combination with court's failure to specify object of alleged conspiracy, constructively amended indictment); *see also United States v. Weiss*, 752 F.2d 777, 791 (2d Cir.) (Newman, J., dissenting in part, stressing need to "vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury"), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). A court's failure to instruct the jury on the specific object of a conspiracy charged under § 371 thus creates a "substantial risk" that the jury may convict the defendant of conspiracy without finding that he had any of the objectives alleged in the indictment. *United States v. Mollica*, 849 F.2d at 729–30.

■ In the present case, the court's oral instructions omitted mention of any of the objects of the conspiracy alleged in the indictment. As quoted in Part I.B. above, the court's instructions described the objects of the conspiracy in terms that neither described conduct that would violate § 1005, nor referred to an objective of obstructing federal regulatory supervision, nor mentioned any intent to defraud. For example, though the court noted that defendants were charged with conspiring to "submit false reports of their interests ... *to* the bank[s]" (Trial Transcript XIV, at 12 (emphasis added)), that phrase did not inform the jury that, in order to convict of the alleged conspiracy to violate § 1005, the jury needed to find that defendants had conspired, *inter alia*, to make

a "false entry *in* any book, report, or statement *of* such bank," 18 U.S.C. § 1005 (emphases added); *see also* Indictment ¶ 19 (alleging "false entries *in* books, reports, and statements *of* IBG and the IBG banks" (emphases added)). More importantly, though the court's instruction stated that the indictment charged defendants with conspiring to obtain loans "without disclosing their interests" (Trial Transcript XIV, at 12), that phrase did not inform the jury that the allegation was that defendants had so conspired with the intent or objective of defrauding the IBG banks or deceiving the federal regulatory authorities. Intent to defraud or deceive, an element of § 1005 and an allegation in the conspiracy count of the indictment, was never mentioned in the court's conspiracy instructions.

■ The government contends that the need to find these objectives was effectively conveyed by the court's instructing the jury to read the indictment and to adhere to its terms in determining defendants' guilt. We disagree. Although at several points the judge told the jury that it was to determine whether the defendants were guilty of the conspiracy "charged in the indictment," and the jury was given a copy of the indictment, at no point did the judge explicitly direct the jury to read the indictment or to note the specific objectives of the conspiracy alleged in count one. Instead, he purported to describe what the government charged "[i]n Count 1 of the indictment," and gave a description of the alleged objectives that stressed defendants' nondisclosure of their interests and did not mention an intent to defraud the banks, or an intent to violate § 1005, or an intent to deceive or obstruct federal agencies. In light of the court's incomplete oral description, we need not consider whether an explicit direction to the jury to read the indictment could have constituted a sufficient instruction on the objects of the conspiracy, because in the present case no such direction was given. From what the jury was in fact told in the present case, it could easily have inferred that the judge's description was an accurate portrayal of what the indictment charged and of all that it

needed to find in order to convict defendants of conspiracy.

The government's reliance on *United States v. Locascio,* 6 F.3d 924 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994), and *United States v. Maldonado–Rivera,* 922 F.2d 934 (2d Cir. 1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991), to support its view that an oblique reference to the indictment suffices, is misplaced. In *United States v. Locascio,* the trial court had in fact properly instructed the jury on the pertinent requirement at the outset of its charge. *See* 6 F.3d at 941. Similarly, in *United States v. Maldonado–Rivera,* the trial court had accurately summarized the object of the alleged conspiracy. *See* 922 F.2d at 961; *see also United States v. Jones,* 30 F.3d 276, 283–84 (2d Cir.) (affirming drug conspiracy conviction where charge adequately instructed jury on objectives of conspiracy *and* "jury was given a copy of the indictment to take with it during its deliberations"), *cert. denied,* —— U.S. ——, 115 S.Ct. 602, 130 L.Ed.2d 513 (1994). In the present case, the only instruction that gave content to the court's references to "conspiracy as charged in the indictment" was the court's own description that omitted mention of § 1005, of an intent to defraud, and of an intent to obstruct federal agencies.

In sum, we find no merit in the government's contention that the district court's instruction on the conspiracy count was sufficient to secure defendants' right to have a jury determine their guilt of the conspiracy actually charged in the indictment.

We also reject the government's argument that the error does not require reversal. It is not entirely clear whether harmless-error analysis is applicable. *Compare Ianniello v. United States,* 10 F.3d 59, 64–65 (2d Cir. 1993) (harmless-error analysis applied to failure to instruct on the relatedness element of a RICO violation, where the jury's finding of guilt as to 44 predicate acts alleged in the indictment provided overwhelming evidence that the jury would have found those acts to be interrelated); *with United States v. Golomb,* 811 F.2d 787, 793 (2d Cir.1987) ("[i]n general, failure to instruct the jury on an essential element of the offense constitutes plain error" requiring reversal), *and United States v. Smith,* 939 F.2d at 11 (characterizing applicability of harmless-error analysis to such a failure as "a close" question); *see also Sullivan v. Louisiana,* —— U.S. ——, —— —— ——, 113 S.Ct. 2078, 2081–83, 124 L.Ed.2d 182 (1993); *id.* at ——, 113 S.Ct. at 2082 (reversal automatically required where the court gave a constitutionally deficient instruction on the government's burden to prove guilt beyond a reasonable doubt, since a reviewing court may not "hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be"). Assuming that harmless-error analysis applies, the error here cannot be deemed harmless.

The court's instructions left the jury without the essential guidance on the primary disputed issue at trial. While defendants largely admitted the nondisclosures and conflicts of interest alleged in the indictment, they sought acquittal principally on the basis that they lacked the intent alleged in the indictment. Especially given the court's actual description of the conspiracy charge only in terms of nondisclosure of the conflicts, the absence of any instruction that, in order to find each defendant guilty on the conspiracy count, the jury needed to find that he had a goal of defrauding the banks, or of fraudulently obstructing the federal government, or of violating § 1005, created a substantial risk that the jury did not consider whether or not defendants had any of the objectives alleged in the indictment. We cannot conclude that the error was beyond a reasonable doubt harmless. Accordingly, we conclude that a new trial on the conspiracy count is required.

**B.** *The Instruction on Coconspirator Liability for Substantive Crimes*

With respect to the substantive counts of the indictment, the trial court attempted to give the jury a *"Pinkerton"* charge (*Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)), which allows the jury to find a coconspirator guilty of a substantive offense that was committed by any of his coconspirators in furtherance of the conspiracy. Defendants con-

tend, first, that the evidence of conspiracy was insufficient to warrant a *Pinkerton* charge at all. That contention is frivolous and does not require discussion. They also contend, with sounder basis, that the *Pinkerton* charge given by the court in this case was incorrect. The government argues that the latter argument has been waived because the objections made by defendants in the district court were insufficient to alert the court to any alleged deficiency in the *Pinkerton* charge as given. We conclude that although defendants did not adequately object in the district court, the incorrect charge was plain error.

■ Once a conspiracy has been established, the criminal liability of its members "extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." *United States v. Bryser,* 954 F.2d 79, 88 (2d Cir.) (citing *Pinkerton,* 328 U.S. at 646–48, 66 S.Ct. at 1183–84), *cert. denied,* 504 U.S. 972, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992). A *Pinkerton* instruction allows a jury " 'to find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy.' " *United States v. Harwood,* 998 F.2d 91, 100 (2d Cir.) (quoting *United States v. Miley,* 513 F.2d 1191, 1208 (2d Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975)), *cert. denied,* —— U.S. ——, 114 S.Ct. 456, 126 L.Ed.2d 388 (1993).

The charge on *Pinkerton* liability given by the district court here was misleading. After explaining the government's burden of proof with respect to each of the substantive counts in the indictment, the court stated as follows:

There is another method by which you may evaluate the possible guilt of the defendants for the substantive charges in the indictment, even if you do not find that the government has satisfied its burden of proof with respect to each element of the substantive crimes.

If you find beyond a reasonable doubt that each of the defendants was a member of the conspiracy charged in Count 1 of the indictment, then you may also find them guilty of the substantive crimes of bank fraud, false entries, false statements, and unlawful commissions as charged in Counts 2 through 13, provided you find each of the following elements as to each defendant: First, that *one* of the crimes charged in the substantive counts was committed; second, that the person or persons you find actually committed the *crime* were members of the conspiracy you found existed; third, that the substantive *crime* was committed pursuant to the common plan and understanding you found to exist among the conspirators; fourth, that the defendant was a member of that conspiracy at the time the substantive *crime* was committed; and, fifth, that the defendant could have reasonably foreseen the substantive *crime* might be committed by his co-conspirators.

If you find beyond a reasonable doubt that all five of these elements exist, then you may find the defendant you are considering guilty of the substantive crimes charged against him, even though you decide he did not personally participate in the acts constituting the crimes or did not have actual knowledge of them.

■ (Trial Transcript XIV, at 33–34 (emphases added).) The court thus described the first *Pinkerton* element as permitting the jury to find a given defendant guilty of the numerous alleged substantive "crimes of bank fraud, false entries, false statements, and unlawful commissions ... provided ... that *one* of the crimes charged in the substantive counts was committed." (Emphases added.) The notion that a defendant could be found guilty of all of the alleged substantive offenses if his coconspirator committed just one of them was reinforced by the court's repeated use of the singular form of the word "crime" when referring to the actual perpetrator of the offense. Permitting the jury to find a defendant guilty of multiple "crimes," if it found that any "one" "crime" had been committed by his coconspirator, was erroneous.

Although defendants' objection at trial, which simply challenged the appropriateness of giving any *Pinkerton* charge at all, did not point out this error, the error was one that plainly affected defendants' substantial rights, and, we think, " 'seriously affect[ed]

the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1781, 123 L.Ed.2d 508 (1993) (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985)). Thus, we need not decide whether the error should be regarded as "structural" in nature and therefore not subject to harmless-error review, *see Sullivan v. Louisiana,* —— U.S. ——, —— ——, 113 S.Ct. 2078, 2081–83, 124 L.Ed.2d 182 (1993), for even assuming that such harmless-error review applies, we cannot confidently say that the guilty verdict rendered on the substantive counts was not attributable to the erroneous charge. Accordingly, we conclude that defendants are entitled to a new trial on the substantive counts.

## CONCLUSION

We have considered all of the government's arguments in support of the judgments of conviction and have found them to be unpersuasive. The judgments are vacated; the case is remanded for a new trial on all counts.