**UNITED STATES of America,**

v.

**Michael BINDAY, James Kevin Kergil, and Mark Resnick, Defendants.**

**No. 12 Cr 152(CM).**

United States District Court, S.D. New York.

Dec. 10, 2012.

Justina Louise Geraci, Sarah Eddy McCallum, Zachary Feingold, United States Attorney Office, New York, NY, for United States of America.

Matthew J. Gaul, Michael Campion Miller, Steptoe & Johnson LLP, Valerie Anne Koffman, Goodwin Procter, LLP, Roger Lee Stavis, Adam Michael Felsenstein, Gallet Dreyer & Berkey LLP, Janeanne Murray, Law Offices of Jane Anne Murray, New York, NY, for Defendants.

## DECISION AND ORDER ON DEFENDANTS' PRETRIAL MOTIONS

McMAHON, District Judge.

Defendants Michael Binday, James Kergil and Mark Resnick are each charged in the instant indictment with conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349 (Count One), mail fraud in violation of Title 18, United States Code, Section 1341 (Count Two), and wire fraud in violation of Title 18, United States Code, Section 1343 (Count Three). The indictment also charges Kergil and Resnick with conspiracy to destroy records and obstruct justice, in violation of Title 18, United States Code, Section 1512(k) (Count Four), and Binday with obstruction of justice, in violation of Title 18, United States Code, Sections 1512(c) and 2 (Count Five).

Defendant Binday has filed a motion asking the Court to dismiss all of the charges against him, or in the alternative, for permission to serve wide ranging pretrial third-party subpoenas pursuant to Federal Rule of Criminal Procedure 17(c). Defendant Kergil and Resnick move to suppress evidence of statements they made on recorded telephone calls before they were indicted. Kergil also asks the Court to order the Government to provide him with a bill of particulars, and Resnick asks that the Government be required to provide early disclosure of *Brady* and *Giglio* material. Defendants each ask that— to the extent that a motion filed by any defendant was relevant to a non-moving defendant's case—they be permitted to join in their codefendants motions. Indeed, the Court has considered all defense motions as to all defendants.

The Government opposes all of the defendants' motions except Binday's motion to dismiss Count Five (the obstruction count against Binday). Indeed, the Government concedes that the obstruction charged in Count Five must be dismissed based on the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995).[1] Accordingly, Count Five is dismissed.

---

1. Count Five alleges that Mr. Binday instructed "CC–2" to tell his clients not to speak with "investigators," and subsequently, Mr. Binday instructed "CC–2" to tell his clients to make false statements to the "investigators." Indictment ¶ 33. The Government's charge

*Background*

According to the Indictment, the defendants—life insurance brokers—are alleged to have engaged in a conspiracy to defraud life insurance providers by making and causing others to make false representations on applications for universal life insurance policies. (*See* Indictment ¶ 7.) The indictment alleges that, from at least 2006 through and including at least 2011, the defendants recruited elderly clients of modest means (the "Straw Buyers") to apply for universal life insurance policies, with the understandings that the Straw Buyers would assign their interests in the policies to third-party investors at the earliest opportunities. (Indictment ¶¶ 12, 13.) The Straw Buyers' consent to the scheme was typically secured through promises of payment upon resale of their policies. (*Id.*) Moreover, the defendants typically arranged to have third parties—not the Straw Buyers themselves—pay the premiums for these policies. (*Id.* ¶ 14.)

The Government contends that the scheme was designed to derive profit from procuring and reselling stranger-originated life insurance ("STOLI") policies (*Id.* ¶ 8), and that its success depended on telling lies to the Providers and engaging in deceptive and obstructive conduct to conceal the fraud. The insurance applications that the defendants submitted to the Providers on behalf of the Straw Buyers were allegedly riddled "with material misrepresentations regarding, among other key elements of the life insurance policy agreements, the Straw Buyers' assets and net worth, the existence of third-party financing of premiums for the policies, the Straw Buyers' intent to resell the policies, the purpose of the policies, and whether the Straw Buyer had other life insurance policies or pending applications for such policies." (*Id.* ¶ 13.) According to the indictment, the defendants knew that these representations were false when made, and took affirmative steps to perpetuate their fraud. (*Id.* ¶¶ 13, 14, 15, and 17.) For example, they funded bank accounts held in the names of the Straw Buyers, or in the names of "trusts" bearing the Straw Buyers' names, and then instructed the Straw Buyers to write premium payment checks on those accounts to the Providers. (*Id.* ¶ 14.) The point of this was to hide from the Providers the true source of the funds. (*Id.*)

The Government contends that the misrepresentations the defendants caused to be made in the insurance applications submitted in the names of the Straw Buyers were material to the Providers. Again, according to the Indictment, "it was the practice of the [Providers] to deny an application for a universal life insurance policy if the insured intended, from the outset, to later resell the policy." (*Id.* ¶ 8.) To implement this practice, the Providers "requested and then relied on representations from insurance agents and applicants regarding: (a) the applicant's financial information; (b) the applicant's intent to resell the policy; (c) the existence of third-party financing of premiums; (d) the purpose of procuring the policy; and (e) the existence of other life insurance policies or applications for policies." (*Id.*) The misrepresentations the defendants made and caused to be made centered on these five areas of inquiry—the areas the Providers had identified and sought to implement as STOLI screens. (*Id.* ¶ 10.)

fails as a matter of law because the Government has not alleged, as it must, that Mr. Binday knew that his actions were likely to affect an official proceeding or even that the investigator in question was an FBI agent. *United States v. Aguilar,* 515 U.S. at 599, 115 S.Ct. 2357.

And the misrepresentations at issue "caused a discrepancy between the benefits reasonably anticipated by the Providers and the actual benefits received." (*Id.* ¶ 9.) "An insured's financial condition, an insured's intent to resell a policy, third-party financing of premiums, the purpose of the policy, and the existence of other life insurance applications and policies significantly informed the [Providers'] financial expectations with respect to universal life policies." (*Id.* ¶ 10.) The Indictment explicitly specifies some of the ways in which the defendants' misrepresentations affected the essence of the bargain. As recited therein, the Providers typically assumed that individuals with higher net worth, who presumably "would maintain a healthier lifestyle" and "receive better medical care," would "live longer than an individual with minimal net worth." (*Id.* ¶ 10(a).) And "the longer an insured lives, the more income that a life insurance company realizes." (*Id.*) The false and gross overrepresentations of insureds' income that the defendants facilitated and made hurt the Providers in two ways: First, the Providers "insured an individual's life that was likely to end earlier than the Provider expected, resulting in less income from premium payments to the Provider and an earlier payout of a death benefit to the beneficiaries." (*Id.*) Second, "misrepresentations regarding insureds' net worth caused Providers to approve—and later pay out—larger death benefits than they otherwise would have approved." (*Id.*)

Misrepresentations about premium financing likewise mattered to the Providers. "A distinguishing feature of a typical universal life policy was an insured's ability to pay premiums in amounts that exceeded the minimum necessary to sustain the policy." (*Id.* ¶ 10(b).) This benefitted both the insured (if he or she held onto the policy) and the Provider: "Aside from allowing the insured to realize tax-free growth, these additional premium amounts typically supplied the [Providers] with significant increased capital and profit." (*Id.*) But these benefits typically would not be realized when the policy was a STOLI policy; "a policy held or funded by a third-party investor typically would be funded at or near the minimum amount necessary to sustain the policy." (*Id.*)

Next, the defendants' lies and deceptions disguising the STOLI nature of the policies they were procuring for the Straw Buyers rendered the Providers' financial projections unreliable. The Providers "assumed, and built into their pricing, the fact that a certain proportion of insureds would voluntarily terminate their policies, either by surrendering them or allowing them to lapse' (i.e., fail to pay the required premiums)." (*Id.* ¶ 10(c).) Similar assumptions concerning lapse or surrender rates could not, however, be applied to STOLI policies, the premiums for which typically were funded through third-party investors. (*Id.*) Misrepresentations that policies were not STOLI when in fact they were, and misrepresentations about premium financing, thus "undermined actuarial assumptions and financial planning that the Providers used to price their policies." (*Id.*)

Finally, the lies about the STOLI nature of the policies at issue and the financing of the premiums under those policies resulted in unexpected delays in premium payments, and hence decreased cash flow for the Providers. "Although third-party investors who secretly funded and/or owned policies typically did not allow policies to lapse, these funders and investors typically took advantage of grace periods and other features that permitted late payments of premiums with greater frequency than insured persons." (*Id.* ¶ 10(c).)

*Binday's Motion to Dismiss Counts One, Two and Three*

█ Binday moves to dismiss Counts One, Two and Three of the Indictment,

which allege that the defendants conspired and schemed to defraud the Providers, in violation of the federal mail and wire fraud statutes. Binday argues that these three counts all allege the same theory of fraud that was held to be insufficient in *United States v. Shellef*, 507 F.3d 82 (2d Cir.2007).

▓▓▓ "An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). As the Second Circuit has explained, "An indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir.1992) (citation and quotation marks omitted).

Consistent with these guiding principles, on a defendant's motion alleging insufficiency of the indictment pursuant to Rule 12(b), the Court accepts as true all allegations in the indictment. *See United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," any inquiry into the sufficiency of the evidence or assertions of fact contrary to those alleged in the indictment is inappropriate. *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir.1998).

▓▓▓ The "essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir.2004), cert. denied, 544 U.S. 1017, 125 S.Ct. 1968, 161 L.Ed.2d 856 (2005). "Because the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way." *United States v. Schwartz*, 924 F.2d 410, 421 (2d Cir.1991). To show a scheme to defraud, the government must present proof that defendants possessed a fraudulent intent. *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987). It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir.1970). As a consequence, the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck. *Id.* at 1182.

Here, the indictment alleges that the defendants made material misrepresentations as part of a scheme to defraud the Providers (describing at length why the lies mattered to the Providers economic decision making), and explains how those misrepresentations actually cause the Providers economic harm. Indictment ¶¶ 9–10(c); *see supra* at 488–89. The Indictment also pleads the requisite use of the mails and wires. Thus, Counts One, Two and Three are sufficient on their face.

Binday's reliance on *United States v. Shellef*, 507 F.3d 82 (2d Cir.2007), to challenge the present indictment is misplaced. The *Shellef* indictment alleged that the defendants, who purchased and then resold certain controlled chemicals, made false representations to their suppliers about what they intended to do with the chemicals they were buying. *Id.* at 107. It further alleged that the suppliers would not have sold the chemicals to the defendants absent the misrepresentations. *Id.* at 109. The indictment did not, however, allege "that there was a 'discrepancy between the benefits reasonably anticipat-

ed' and actual benefits received" by the suppliers as a result of these misrepresentations. *Id.* (citation omitted). Given this pleading defect, the Second Circuit vacated the defendants' wire fraud convictions, reasoning that the jury could have improperly convicted based on a bare determination that the defendants had misrepresented a fact that had no " 'relevance to the object of the contract.' " *Id.* at 108 (citation omitted).

Here, however, the Indictment alleges that the defendants' misrepresentations **"caused a discrepancy between the benefits reasonably anticipated by the Providers and the actual benefits received"** (Indictment ¶ 9), and then spells out four different ways in which the lies that the defendants told, caused to be told, and schemed to tell affected the Providers' bottom line (*see id.* ¶ 10). These allegations are precisely the types of allegations that were missing in *Shellef.* Given the *"Shellef"* language in the present indictment, there is no danger that a jury might improperly convict the defendants at bar based on a misrepresentations that had no relevance to the object of the contracts in question. *See Shellef,* 507 F.3d at 109.

To the extent that Binday is attempting to challenge the sufficiency of the indictment by referencing documents and alleged facts that fall outside the four corners of the indictment (*See* Binday Rule 12(b) Mem. at 4–5) (citing excerpts from policies issued by Phoenix, Security Mutual, Union Central, AIG, and Lincoln), the argument is unavailing. It is axiomatic that the allegations in the indictment control the analysis at this stage of the case. *See United States v. Goldberg,* 756 F.2d at 950.

Defendant Binday's motion to dismiss Counts One, Two and Three is denied. However, as previously noted above, Count Five is dismissed, with the Government's consent.

### *Binday's Rule 17(c) Subpoena Requests*

█ According to Binday, the crux of his defense at trial will be that, to the extent any false statements were made, or caused to be made, by any defendant, those statements were not material to the insurance companies in deciding to issue the offending policies. (Binday "Rule 17" Memo at 18). Binday states that he has uncovered documents that suggest the alleged misrepresentations were not material, and that while the insurance companies paid lip service to detecting and rejecting STOLI, they in fact created an environment that made it easier to sell high value senior policies to be re-sold to investors. *Id.* at 18–19. Binday surmises that the existence of such documents strongly indicates that additional "exculpatory" documents exist in the insurance companies' files.

In pursuit of those additional "exculpatory" documents, Binday requests permission to issue subpoenas *duces tecum* to the insurance companies, pursuant to Rule 17(c). (*Id.* at 1). Binday's proposed Rule 17 subpoena calls for the production of a vast array of documents (the requests fill eight single spaced pages). Examples of the wide range of documents requested by the subpoena include: "All documents relating to any policy an Insurer issued on the life of a Specified Individual ... All documents concerning instances where universal life insurance underwriting guidelines concerning financial status were waived, ... All documents relating to the difference in the rate of late payments of premium between third-party financed or owned life insurance policies and other life insurance policies, ... All documents produced in any litigation concerning any High Value Senior Policy, including in the following litigations: (listing 47 separate

civil actions from around the country), . . . All documents relating to any reinsurance treaty or treaties that covered High Value Senior Policies, including the treaties themselves. (*See generally*, Subpoena Schedule). Essentially, Binday wants the insurance companies to turn over all of their files, and all correspondence by e-mail and otherwise, that relate **in any way** to $2 million-plus policies purchased by persons over 70 years old, whether or not those policies are the subject of the instant indictment. This is not a proper use of a pre-trial Rule 17(c) subpoena.

■ A pretrial Rule 17(c) subpoena is "not intended to provide a means of discovery for criminal cases." *United States v. Nixon*, 418 U.S. 683, 700, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Such a subpoena—whether issued by a defendant or by the Government—should not issue unless it meets three criteria: "(1) relevancy; (2) admissibility; (3) specificity." *United States v. Nixon*, 418 U.S. at 700, 94 S.Ct. 3090. In adopting this three-pronged test, the Supreme Court in *Nixon* cited with approval a similar test articulated by Judge Weinfeld in *United States v. Iozia*, 13 F.R.D. 335 (S.D.N.Y.1952):

(1) That the documents are evidentiary and relevant;

(2) That they are not otherwise procurable by the defendant reasonably in advance of trial by the exercise of due diligence;

(3) That the defendant cannot properly prepare for trial without such production and inspection in advance of trial and the failure to obtain such inspection may tend unreasonably to delay the trial;

(4) That the application is made in good faith and is not intended as a general fishing expedition.

*Id.* at 338; *see Nixon*, 418 U.S. at 699–700, 94 S.Ct. 3090. The rationale for imposing these limitations on pretrial (as opposed to

trial) subpoenas under Rule 17(c) is that the rule is not intended as a discovery device, and an impermissible discovery motive is much more likely to underlie a subpoena calling for a return well in advance of trial than one issued for return the date trial is set to begin. *See United States v. Amirnazmi*, 645 F.3d 564, 595 (3d Cir.2011).

■ Notably, a proposed subpoena does not satisfy the *Nixon* three-pronged test if it seeks material that could be used at trial only to impeach a witness. As the Supreme Court in *Nixon* observed, "Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." 418 U.S. at 701, 94 S.Ct. 3090.

The Government opposes the issuance of Binday's broad subpoena. Apparently, much of the material called for by the proposed subpoena is already the subject of a trial subpoena that the Government issued to the insurance companies at defendants' request. According, to the Government, "one of the Subject Providers has produced responsive documents, and the remaining Subject Providers have assured the Government that they will produce their responsive documents well in advance of trial." (Govt. Memo at 15). Thus, to the extent such overlap exists, the Binday subpoena contemplates an improper use of Rule 17(c), because the documents called for will be produced by other means in advance of trial. *See Nixon*, 418 U.S. at 700, 94 S.Ct. 3090.

To the extent Binday's proposed subpoena goes beyond the trial subpoena the Government has already issued at defendants' behest, it appears to be a fishing expedition, not a targeted request for evidentiary matters as required by *Nixon* and its progeny. *Cf. Nixon*, 418 U.S. at 699–700, 94 S.Ct. 3090 (adopting Judge

Weinfeld's criterion that "the application [be made] in good faith and ... not [be] intended as a general 'fishing expedition' ").

Finally, it is not at all clear that the documents Binday seeks that were generated from civil lawsuits around the country involving STOLI transactions would be admissible at trial. For example, deposition testimony from witnesses in those cases would be hearsay.

Accordingly, the court will not authorize Binday's proposed subpoena. If, if after reviewing the documents produced pursuant to the trial subpoena issued to the insurers by the Government, defendant has a good faith basis to believe that there are still **specific** documents in the possession of the subject providers that are properly discoverable pursuant to a Rule 17(c) subpoena, the Court will entertain a narrower and more tailored request.[2]

*Kergil and Resnicks Motion to Suppress Statements*

■ Defendants Kergil and Resnick move to suppress recorded statements they made to a cooperating witness prior to indictment but at a time when both defendants were represented by counsel. At issue are recordings made by a co-conspirator ("CC–2"), who was cooperating with the Government, of three telephone calls he had with Resnick between July and September 2010 and one call he had with Kergil in November 2011. At the time of each call, the defendants had not been indicted but were—as the Government was aware—represented by counsel. Defendants argue that suppression is war-ranted because the statements were obtained in violation of Rule 4.2 of the New York Rules of Professional Conduct.

According to the Indictment, in June 2010, FBI agents approached Resnick at his residence in Orlando, Florida in connection with a federal grand jury investigation. They also approached CC–2 at his residence. (*See* Indictment ¶ 32.) Around the same time, FBI agents tried to locate and interview Kergil, and he became aware of those attempted visits. (*See* Stavis Decl. ¶ 2.) Within days of the visits from the FBI, Resnick and CC–2 each spoke to Kergil by telephone about destroying documents and computer files that were relevant to the grand jury investigation. (Indictment ¶ 32.) Kergil instructed Resnick and CC–2 to delete the contents of their hard drives and any life insurance-related documents involving Kergil and Binday. (*Id.*) Kergil and CC–2 both agreed to follow Kergil's instructions, and both attempted to delete relevant documents and files. (*Id.*)

On July 12, 2010, Janeanne Murray, Esq., telephoned AUSA Feingold (one of the Assistant United States Attorneys assigned to this case), to tell him that she had been retained to represent Mr. Resnick. (Murray Decl. ¶ 4.) Likewise, on July 15, 2010, Roger Stavis, Esq., called Feingold to let him know that he would be representing Kergil. Stavis says that he made clear to Feingold that "government agents could neither approach nor question Kergil outside his presence." According to Stavis, "AUSA Feingold readily agreed to these terms, assuring me that

---

**2.** If the Government takes the position that only documents that specifically refer to the particular policies underlying the indictment are relevant, I am constrained to disagree. It would be a rare event indeed for an insurer to indicate in contemporary notes that particular matters were or were not relevant to the decision to insure. Company policies, however, or company training materials that are binding on all its agents in their pursuit of business would be highly relevant to the issue of materiality, and not just as fodder for impeachment of insurance company witnesses.

government agents would not speak with Mr. Kergil outside of my presence." (Stavis Declaration at ¶ 4).

Meanwhile, in early July, CC–2 began recording telephone calls he had with Kergil and Resnick. Four of those recordings—the recordings made after Ms. Murray and Mr. Stavis spoke with AUSA Feingold—are the subject of defendants' motion to suppress.[3]

Call No. 1 (CC–2 calls Resnick) (July 23, 2010): On this call, Resnick discusses, among other things, his efforts and those of CC–2, to destroy evidence relevant to the grand jury investigation at Kergil's direction. The only portion of the call that the Government intends to offer into evidence at trial is as follows:

[Resnick]: ... Hasn't your guy spoken to the prosecutors?

[CC–2]: Yeah, but it's all, you know, I don't have anything definite yet. You know, you just—like he said, they're getting information you don't know. You know I'm just concerned about this, this hard drive and these emails and everything.

[Resnick]: I don't think that's really much of an issue. Um, but has he made a big deal about that?

[CC–2]: Yeah

[Resnick]: Well, I mean you have ... they put yours back, right?

[CC–2]: Yeah but still, you know, Kevin you know told me to delete stuff and I did it.

[Resnick]: Right. Right.

[CC–2]: You know? They can get all of it from AOL.

[Resnick]: Yeah I think they can put that back. I don't think that's such a

big—I mean it doesn't look good that it was done, but, um, you know as far as what's on there, you know even if you delete something, I think they can pretty well bring it back. And um, I think they can get everything they want, you know from Michael's records. Michael has, I'm sure, complete records of everything. So, um

[CC–2]: Yeah, but still, I went in there and deleted stuff because he told me to.

[Resnick]: Right, yeah pretty much everything Kevin told us was wrong, so

[CC–2]: Yeah, I mean I can't believe, you know I would have never done that. I questioned it when I did it.

[Resnick]: Me too. Hey [CC–2], I got on a plane and came back here, you know went back home the next day and I did it so, um, it was stupid to do, and it makes us look uh, like we did something. But, uh

[CC–2]: Right.

(Murray Decl., Ex. A at 4–5.)

Call No. 2 (CC–2 calls Resnick) (August 13, 2010): On this call, which the Government does not intend to offer at trial, Resnick and CC–2 briefly discuss a particular STOLI policy and an individual involved in premium financing for that policy.

Call No. 3 (CC–2 calls Resnick) (September 18, 2010): This call, which the Government intends to offer at trial, relates to the defendants' personal investments in a STOLI policy that they had fraudulently procured, using a Straw Buyer in Florida who subsequently developed terminal cancer. After the defendants learned of the Straw Buyer's illness, they formed a limited liability company to purchase the Straw

---

3. CC–2 recorded a telephone conversation he had with Kergil on July 15, 2010. However, that call was made before Mr. Stavis spoke with AUSA Feingold latter that day. During that conversation, which is not a subject of defendants' motion to suppress, the two men discussed Kergil's instructions to CC–2 to destroy evidence.

Buyer's STOLI policy in an effort to receive the $4 million death benefit upon the Straw Buyer's death. On the call, Resnick and CC–2 discuss the need for Resnick and Binday to keep abreast of the health status of the Straw Buyer so that they can monitor their investment. During the conversation, Resnick asks CC–2, who was the agent on the policy and who had the relationship with the Straw Buyer, to lift a "block" he believed CC–2 had placed on health information relating to the Straw Buyer, and to call the Straw Buyer to inquire about his health:

[Resnick]: ... We're trying to keep track of that case. Um, I don't know where you're at with it, you know, whether you've abandoned it, or you've turned it over to them, or where you're at with that.

[CC–2]: Mark, all I know is I put my life savings into that. You know and um ... (interrupted)

....

[Resnick]: Ok, alright. So here's what I know, [CC–2], and you correct me if what I'm saying is inaccurate, but from what I'm told, a couple of months ago, Michael asked you to speak to [the Straw Buyer] and allow a block to be put on the records, so that nobody could get updated records on the case.

....

[CC–2]: Oh, ok for medical records. Yeah, you know what? It's been so long ago, and as I remember he did say that at one time, he did call me. That was like back right before we did this thing, back in June or May. And he said that it's very important that nobody has access to his medical records. Michael did say that.

[Resnick]: Exactly.

[CC–2]: But then he turned around and released the block. You call it a block, I don't know because they needed to get

upgraded information on his medical progress.

[Resnick]: Right.

[CC–2]: It seemed like—as best as I can recall—that was in June right after we finished the Hudson Valley [i.e., the purchase of the policy through an LLC], you know, he says "well, we need access," you know. But I can't remember whether that has been okay-ed or not to where they could get the medical records of his progress. I don't know. I haven't talked to [the Straw Buyer] lately, you know, since I haven't talked to him since June.

[Resnick]: OK, I understand that. So, um, what we're trying to do is get up-to-date records so we know exactly where we stand with them. I mean, for all we know he could have passed away and we don't even know. I'm not assuming that, but I'm just saying that we have all that tied up in that, and we don't have any idea of where we're at with that.

....

[Resnick]: And I just want to find out what's going on and see if he says "Yeah. [CC–2] I'm doing great. I'm doing much better. You know, the chemo really helps." Or "well about the same" you understand what I'm saying?

....

(Murray Decl., Ex. B at 2–4.)

Call No. 4 (CC–2 calls Kergil) (November 8, 2011): This call between CC–2 and Kergil concerns the defendants' continuing scheme regarding their investment in the above-referenced Florida STOLI policy. On the call, Kergil explains that he and CC–2 and Resnick should try to sell the STOLI policy that they have purchased, because it appears that the Straw Buyer will likely live longer than anticipated:

[Kergil]: ... Let me explain. The cost ... the cost of insurance has gone up. I've got the report here from Phoenix. So the numbers that we originally ran aren't applicable anymore. So now we've got, we've got higher ... the premiums are higher. He appears to be either getting better or on his way, maybe on his way to recovery. I don't know.

[CC–2]: Uh-huh.

[Kergil]: We'd like to get our money back is what we'd like.

[CC–2]: Well yeah, so would I.

. . . .

(Ex. Cat 3.)

Prior to indictment, the Government and its agents are "authorized by law" to "employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir.1988). This includes gathering evidence through undercover means from individuals who are known to be represented by counsel. *Id.* The only limitation upon this general authorization is that a prosecutor may not engage in "egregious misconduct" in overseeing the pre-indictment phase of the investigation. *United States v. Nouri,* 611 F.Supp.2d 380, 385 (S.D.N.Y.2009); *see United States v. Hammad,* 858 F.2d at 839–840. This limitation stems from New York Rule of Professional Conduct 4.2(a) (formerly Disciplinary Rule 7–104), which provides that, "in representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law." 22 N.Y.C.R.R. § 1200.0 (4.2(a); *see also* 28 U.S.C. § 530B (rendering state disciplinary rules applicable to Government lawyers).

The only case in this Circuit that found "egregious misconduct" under these governing principles is *Hammad* itself. There, the prosecutor had gone beyond merely authorizing the use of an informant to record statements made by a represented target; he created a fake subpoena for the informant to use in sparking conversation about the subject matter of the investigation. *See Hammad,* 858 F.2d at 836. The court determined that this particular device "contributed to the informant's becoming that alter ego of the prosecutor," and thus "violated the disciplinary rule." *Id.* at 838.[4] Having found as much, the court emphasized once more that "use of informants by government prosecutors in a preindictment, non-custodial situation, absent the type of misconduct that occurred in this case, will generally fall within the 'authorized by law' exception to [Rule 4.2(a)'s predecessor]." That general rule has been applied repeatedly by courts in this circuit to confirm the propriety of undercover recordings of represented but unindicted targets, and to deny motions to suppress the resulting statements. *See, e.g., United States v. Basciano,* 763 F.Supp.2d at 330; *Nouri,* 611 F.Supp.2d at 387–88; *Mahaffy,* 446 F.Supp.2d at 127–29; *United States v. Benjamin,* 72 F.Supp.2d 161, 192–93 (W.D.N.Y.1999). It applies here as well.

Since *Hammad,* the Second Circuit has urged "restraint in applying [Rule 4.2(a)]

---

4. The Circuit declined to order suppression of the evidence in *Hammad* because the law governing application of the disciplinary rule had previously been unsettled. *Hammad,* 858 F.2d at 839, 842.

in the pre-indictment context so as not to unduly hamper legitimate law enforcement investigations," *Grievance Comm. for the S. Dist. of New York v. Simels,* 48 F.3d 640, 649 (2d Cir.1995), and the district courts within the circuit have heeded that admonition. *See, e.g., United States v. Basciano,* 763 F.Supp.2d 303, 330 (E.D.N.Y.2011) (denying motion to suppress undercover recordings made of represented target); *United States v. Nouri,* 611 F.Supp.2d at 388 (denying motion to suppress recorded statements made by co-operating witnesses of represented targets, where some of recordings occurred shortly after targets left meetings with their counsel); *United States v. Mahaffy,* 446 F.Supp.2d 115, 128–29 (E.D.N.Y.2006) (denying motion to suppress undercover recordings of represented target).

Kergil's and Resnick's motions to suppress are denied.

*Kergil's Motion for a Bill of Particulars*

 Defendants seek a bill of particulars that would have the Government specify *inter alia* all Straw Buyers whom the defendants allegedly used to purchase STOLI policies and all of the misrepresentations contained within each of the applications submitted on behalf of each Straw Buyer.

 The proper scope and function of a bill of particulars is to furnish facts, supplemental to those contained in the indictment, necessary to apprise the defendants of the charges against them with sufficient precision so as to enable them to prepare a defense, to avoid unfair surprise at trial, and to preclude a second prosecution for the same offense. Fed.R.Crim.P. 7(f); *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990), *overruled on other grounds as recognized by United States v. Marcus,* 628 F.3d 36 (2d Cir.2010); *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987); *United States v. Panza,* 750

F.2d 1141, 1148 (2d Cir.1984). If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," such as discovery or other correspondence, no bill of particulars is required. *Bortnovsky,* 820 F.2d at 572.

Here, the 32–page indictment is extremely detailed and voluminous discovery has already been provided to defendants. Defendants have more than enough information about the charges against them to enable them to prepare their defense, avoid unfair surprise at trial, and preclude a second prosecution for the same offense. Fed.R.Crim.P. 7(f); *Torres,* 901 F.2d at 234.

In any event, with respect to the alleged straw buyers, the Government says that it has already provided defendants with this information, including an electronic folder entitled "Large Case Files," obtained from R. Binday Plans and Concepts. According to the Government, this folder includes individual files for 100 or so Straw Buyers whom the defendants recruited to participate in the fraudulent STOLI scheme, including documents bearing the five misrepresentations identified with particularity in paragraph 16 of the Indictment. To make sense of these documents, the Government says that it has provided defendants with a six-page index detailing the contents of the discovery, which identifies the Straw Buyers, and guides the defendants to the precise locations of specific documents within the overall production. (*See* Govt. Memo at 47).

Defendants' request for a bill of particulars is denied.

*Brady, Giglio, Jenks Act, 404(b) and Other Disclosures and Filings*

The Government represents that it recognizes its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and is not aware of any

undisclosed *Brady* material, but will turn over any *Brady* materials it uncovers in a timely fashion. (Govt. Memo at 41). The Court accepts the Government's representation, but reminds the Government that "timeliness" with respect to *Brady* disclosure means immediate disclosure upon discovery.

Given the relative complexity of this case, the Government shall provide defendants with all impeachment and Jencks Act material one month prior to trial.

The Government shall provide 404(b) notice one month prior to trial. All *in limine* or 404(b) motion—by either the Government or the defendant—must be filed three weeks prior to trial, with opposition papers due two weeks prior to trial. The Court will rule on the motions at the final pretrial conference.

The Government will provide defendant with a list of the witnesses it intends to call, the Friday before the trial week those witnesses are scheduled to testify. Should defendants elect to call witnesses, defendants will reciprocate by providing the Government with similar notice of the witnesses to be called.

Proposed *voir dire* questions and all request-to-charge are to be submitted prior to the final pre-trial conference.

This constitutes the decision and order of the Court.